**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**

| | |
|---|---|
| JUAN GAMBOA, Individually, And On Behalf Of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>CITIZENS, INC., HAROLD E. RILEY, RICK D. RILEY, KAY E. OSBOURN, GEOFFREY M. KOLANDER, and DAVID S. JORGENSEN,<br><br>Defendants. | Case No.: 1:17-cv-00241-RP<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Lead Plaintiffs Juan Gamboa and Correy Hemingway ("Plaintiffs"), individually and on behalf of all other persons similarly situated, file this Amended Complaint against Defendants. The allegations in this Amended Complaint are based upon the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Citizens, Inc. ("Citizens" or the "Company"), and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## SUMMARY OF COMPLAINT

1. This is not a case about investors complaining of poor stock performance. This is a case about Citizens' long-standing fraudulent scheme to sell insurance policies to foreigners to prop up its stock price to artificially high levels.

2. Citizens is an insurance company that sells whole-life insurance policies primarily to foreign customers. The Company is a Colorado corporation, but maintains its headquarters in Austin, Texas.

3. To avoid U.S. regulation, Citizens controls and trains a so-called "independent" network of 3,000 foreign sales consultants who sell whole-life insurance policies to foreign customers, mainly in South America and Taiwan. The policies are particularly attractive because they are denominated in U.S. dollars and guarantee a certain level of returns, which allows foreign customers to hold and receive insurance proceeds and dividends in a stable currency, unlike, for example, the Venezuelan bolivar or Colombian peso.

4. Citizens trains its sales force to use unlawful growth projections regarding Citizens' stock to steer foreign policyholders into the Citizens Stock Investment Plan, whereby policy dividends are automatically used to purchase the Company's stock. Defendants know that the projections provided by Citizens' unlicensed brokers cannot pass muster under U.S. actuarial and insurance regulations. Based on these promised outsized returns, the majority of the Company's common shares are owned by foreign policyholders who continue to purchase shares automatically under the Plan as dividends are paid on the policies, artificially propping up the Company's stock price.

5. For much of its history, the Company claimed that its life insurance policy proceeds and dividends were exempt from U.S. taxes.[1] That all changed in 2015, when Citizens announced that a "substantial portion" of its life insurance policies "do not qualify for the favorable U.S. federal income tax treatment" under Section 7702 of the Internal Revenue Code. In plain terms, almost all of the life insurance policies Citizens sells to foreigners are now subject to U.S. laws and deemed taxable.

[1] The Plan's Prospectus states: "Generally, life insurance policy benefits, which you may assign to the Plan for investment, are not taxable as income to you."

6. But Citizens continues to market and sell policies as tax-exempt to foreign customers because it requires, in Ponzi-like fashion, a constant influx of new foreign customers to purchase the Company's stock. If Citizens sales force were to disclose to foreign customers that they will have to pay U.S. income taxes on their policy benefits, then none of these customers would purchase a policy, and existing customers would either abandon or cash in their policy. This, in turn, would reduce the artificially created demand for Citizen's stock through the Plan. Simply put, the scheme would end and Citizens' business would fail.

7. Since the Section 7702 issue was disclosed in 2015, Defendants have done everything in their power to suppress, cover up, and delay the inevitable unwinding of Citizens' fraudulent scheme:

- The Company's Chief Financial Officer was fired *three weeks* into his tenure when he refused to sign off on Citizens' financial disclosures after discovering Defendants' fraudulent scheme.

- The Company wrongfully blamed and fired its Vice President and Chief Actuary for its Section 7702 issues. Yet more than two years later, the Company has still failed to remediate its material weaknesses over its actuarial functions.

- Rick Riley, Citizens' former CEO, Chairman and director, unlawfully created an insurance policy that paid him a six-percent guaranteed return. Once he was caught by the firm's Audit Committee, Defendants lied and covered up Rick Reilly's self-dealing by stating that he was resigning due to health reasons.

- As an ominous harbinger and red flag, in June 2017, Ernst & Young resigned as Citizens' public auditing firm – the second consecutive outside auditor to part ways with Citizens.

- Defendants failed to disclose that the Company is under SEC investigation regarding its marketing of policies to foreign customers and the Citizens Stock Investment Plan.

- Defendants failed to disclose that the Company is under IRS investigation.

- Citizens has not had a *single* analyst conference call for over two years to answer the public's questions about its business practices in light of the Section 7702 issue. Instead, Defendants concealed the Company's scheme through misleadingly false and opaque SEC disclosures.

8. Because the vast majority of Citizens' policyholders are foreign, the Company has managed to evade scrutiny from state insurance regulators who serve to protect only their local constituents. The Texas Department of Insurance turns a blind eye to Citizens' practices. The Colorado Division of Insurance is equally unconcerned. The federal securities laws, however, were designed to precisely prevent the type of fraud here.

9. Citizens' scheme was unmasked on March 8, 2017, when Seeking Alpha published an article exposing the Company's unlawful business practices and that it was under SEC and IRS investigation.[2] In its 2016 Annual Report filed several weeks later, the Company finally disclosed its material weaknesses over its financial reporting, sales practices, and actuarial capabilities. The Company also announced that it was reconsidering the viability of selling policies in international markets. In the wake of these disclosures, Citizens stock declined sharply, harming investors.

## NATURE OF THE ACTION

10. This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants who purchased or otherwise acquired the publicly traded securities of Citizens from March 11, 2015 through April 27, 2017, both dates inclusive (the "Class Period"). Plaintiffs seek to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

## JURISDICTION AND VENUE

11. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

[2] The article is attached as Exhibit A, and the supporting documents for the article are attached as Exhibit C.

12. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. §78aa).

13. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the Company conducts business in this judicial district.

14. In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

**PARTIES**

15. Plaintiffs, as set forth in their PSLRA certifications previously filed with the Court which are incorporated by reference herein, purchased Citizens securities at artificially inflated prices during the Class Period and were economically damaged thereby.

16. Defendant Citizens, through its subsidiaries, provides life insurance products in the United States and internationally. Citizens is incorporated in Colorado and headquartered at 400 East Anderson Lane, Austin, Texas. Citizens' securities trade on the New York Stock Exchange ("NYSE") under the ticker "CIA."

17. Defendant Harold E. Riley was the Company's Chairman and Chief Executive Officer ("CEO") from the beginning of the Class Period until June 2, 2015. Harold Riley founded the Company in 1969 and continues to control the Company via the Harold E. Riley Trust, of which Harold Riley is Trustee and which owns 100% of the Company's Class B common stock. The Class B stock elects a simple majority of the Company's Board and receives one half of any cash dividends paid to the Class A shares. Harold Riley devised a succession plan by which the

Company's Board of Directors appointed Defendant Rick D. Riley, Harold's son, to succeed Harold as Chairman and CEO on June 2, 2015.

18. Defendant Rick D. Riley was the Company's Chairman and CEO from June 2, 2015 until his resignation on June 8, 2016. Rick Riley, Harold Riley's son, worked for Citizens in various capacities since 1976, and served as Citizens' Vice Chairman, President and Chief Corporate Officer from 2007 until his appointment as Chairman and CEO. Rick Riley announced his retirement and resignation from the Citizens Board on June 24, 2016, shortly after resigning from his positions as Chairman and CEO. The Company failed to disclose that Rick Riley was terminated for engaging in an unfair and undisclosed related-party transaction where he created a lucrative Company insurance policy for himself and his family.

19. Defendant Kay E. Osbourn was the Company's interim CEO and President from June 8, 2016 until November 7, 2016. Osbourn was elected President on June 2, 2015. She initially joined Citizens as Vice President, Internal Audit, in April 2008. In March 2009, she became Vice President, Treasurer and Chief Financial Officer ("CFO"), and was appointed Executive Vice President in 2010. Osbourn continued her role as Treasurer and CFO until October 12, 2015. Osbourn re-assumed the position of CFO on November 6, 2015 until Defendant Jorgensen was appointed to those positions later that month.

20. Defendant Geoffrey M. Kolander has been the Company's CEO since November 7, 2016. Previously, Kolander served as Senior Vice President, Chief Legal Officer and Corporate Strategy since June 2, 2015. Kolander joined Citizens in 2006 as its Vice President and General Counsel, and was appointed Corporate Secretary in 2007. He served as Executive Vice President, General Counsel and Corporate Secretary since 2010. Kolander is a licensed attorney in Colorado, Texas and New York.

21. Defendant David S. Jorgensen has been the Company's Vice President, CFO and Treasurer since his election to those positions by the Board in November 2015.

22. Defendants Harold Riley, Rick Riley, Osbourn, Kolander, and Jorgensen are collectively referred to herein as the "Individual Defendants."

23. Each of the Individual Defendants:

(a) directly participated in the management of the Company;

(b) was directly involved in the day-to-day operations of the Company at the highest levels;

(c) was privy to confidential proprietary information concerning the Company and its business and operations;

(d) was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e) was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f) was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g) approved or ratified these statements in violation of the federal securities laws.

24. Citizens is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

25. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Citizens under *respondeat superior* and agency principles.

26. Defendant Citizens and the Individual Defendants are collectively referred to herein as "Defendants."

## WITNESSES

27. Plaintiffs' investigator and counsel spoke with former Citizens employees who have personal knowledge of the facts alleged in this Complaint.

28. Former Employee 1 ("FE 1") served as the Company's Vice President and Chief Actuary from August 2006 until February 26, 2015. After FE 1 repeatedly voiced his concerns to Rick Riley, Kolander, and Osbourn that the growth projections for Citizens stock touted by Citizens' sales force did not comply with actuarial regulations if the policies were subject to U.S. laws, he was fired.

29. Former Employee 2 ("FE 2") served as the Company's CFO for 25 days in October and November 2015. Mere weeks into his tenure, FE 2 discovered and reported to Kolander and Osbourn various accounting and internal control deficiencies within the Company, refused to sign off on the Company's quarterly report filed with the SEC unless the problems were addressed or disclosed, and was subsequently fired by Citizens.

30. Former Employee 3 ("FE 3") worked at the Company for approximately nineteen years. From 2006 to October 2015, he served as the Company's International Marketing Director.

## SUBSTANTIVE ALLEGATIONS

### Citizens' Life Insurance Scheme and Stock Purchase Plan

31. Citizens is an NYSE-listed life insurance company based in Austin, Texas. The Company was founded in 1969 by its longtime CEO and controlling shareholder, Defendant Harold Riley.

32. The Company has grown from less than $100 million in assets in the early 1990s to over $1.5 billion today by devising an unstainable scheme requiring a constant influx of new

policyholders to prop up its stock price. Whenever Citizens' employees and executives, including its Chief Actuary and Chief Financial Officer, have called the Company's business practices and financial disclosures into question, Defendants have simply terminated the employees to cover up the Company's scheme.

33. Through its subsidiaries, Citizens sells whole-life insurance and endowment policies to high-net-worth individuals in Latin America. Citizens' insurance policies are attractive to South Americans and other foreign customers because the policies are denominated in U.S. dollars. This allows foreign customers to hold and receive insurance proceeds and dividends in a stable currency, unlike, for example, the Venezuelan bolivar or Colombian peso. Citizens markets its whole-life policies as a vehicle for foreign customers to convert their wealth into U.S. dollars through a purportedly tax-free death benefit and the Citizens Stock Investment Plan (the "Plan").

34. Once a policyholder pays the annual premium and the policy is issued, the owner becomes entitled to a cash dividend as well as an annual guaranteed endowment, if elected. The policyholder is presented with several options with the dividend and annual guaranteed endowments, including the right to assign those values to the Plan. The Plan is administered by Citizens' independent plan administrator and transfer agent, Computershare Trust Company, N.A., which makes open market purchases of Citizens stock on behalf of policyholders.

35. Enticed by the grossly outsize projections touted by the Company's so-called independent brokers, foreign policyholders overwhelmingly opt to reinvest their annual policy benefits and dividends directly into Citizens stock. The majority of the Company's common shares are owned by foreign policyholders who continue to purchase shares automatically under the Plan as dividends are paid on the policies. Citizens states that approximately 89-95% of the stock purchased under the Plan are purchased by foreign policy holders. Stock analysts have estimated,

based on Citizens' limited public filings, that approximately 70% of the Company's outstanding common stock is owned by Plan participants, and participants' purchases through the Plan have historically accounted for roughly $15 million in annual share purchases.

36. In short, Citizens creates a recurring demand for its stock through the Plan. This causes the Company's stock to trade at earnings multiples that are much higher and inconsistent with its peers.

37. The performance of Citizens stock drives most of the returns to existing policyholders, so Citizens' ongoing viability is therefore directly dependent on policyholders continuing to buy Citizens stock, which keeps its stock price propped up. To maintain the illusion of the outsize returns promised to policyholders, Citizens depends on a constant influx of new money from new policy sales generated through its multilevel marketing sales force.

**Citizens Knowingly Allows and Trains its Multilevel Marketing Sales Force to Mislead Policyholders**

38. To keep its scheme alive, Citizens uses a network of about 3,000 "independent" brokers to sell whole life insurance policies, primarily through its subsidiary, CICA Life Insurance Company of America ("CICA").[3] The policies are largely sold to middle class and wealthy foreign citizens from South American and Pacific Rim countries such as Venezuela, Colombia, Taiwan, Ecuador and Argentina.

39. Citizens describes its international sales force as "independent marketing consultants" working under the purview of "independent marketing firms" for two reasons. First, it allows Citizens to sell insurance policies in foreign countries without a license. Second, it provides the Company a firewall of plausible deniability regarding its sales force's illegal and misleading sales practices.

---

[3] Defendant Osbourn is the President of CICA.

40. Based on interviews of seven current or former CICA brokers, in reality, the "independent" CICA brokers are invited to train at the Company's Citizens Academy located on Lake Buchanan in Texas, where Company officials host and lead sales seminars that teach brokers how to target and sell to foreign retail investors.[4] According to Citizens' 2008 annual report, Citizens Academy is "the Company's meeting and training facility" and the Company uses the facility for, among other things, the "training of USA and International marketing associates," or brokers. Citizens Academy LLC is still listed as a subsidiary of Citizens on the Company's 2016 annual report, but Citizens has not disclosed the purpose of the Citizens Academy since the 2008 annual report.

41. Based on CICA training materials, to further entice brokers to increase sales, Citizens creates and promotes a multi-level marketing compensation scheme and encourages brokers to set up a "pyramid of associates," whereby brokers are paid a portion of commissions for sales made by sales associates recruited by the broker.

42. Brokers are trained by Citizens to sell the policies as safe, U.S. dollar-denominated "savings accounts" that are largely invested in U.S. treasury bonds and subject to favorable tax status. Policies are sold with promises of "guaranteed returns" of 3-7% annually in addition to lucrative returns from Citizens stock. In reality however, the money is not invested in U.S. Treasuries and most of the "guaranteed" returns are driven by the policyholder's investment in Citizens' common stock.

43. The brokers show potential clients projections that claim to illustrate how the policies will accrue value, often hinging on the brokers' unfounded and unlawful projections that Citizens stock will appreciate by incredible annual rates, ranging from 7-14%.

---

[4] See Exhibit B (CICA broker training materials), filed herewith.

44. Many of the unsophisticated foreign retail investors are led to believe that the forecasted stock-driven returns are guaranteed. Yet the policies appear to produce little, if any, actual guaranteed returns.

45. According to FE 1, a former Vice President and Chief Actuary at Citizens, the sales team at Citizens was permitted to input any stock projection information they wanted into marketing documents and spreadsheets provided to their clients. Even though CICA is a USA-based subsidiary that issues the policies, the Company did not consider the foreign clients' policies to be U.S. policies, and so the Company deemed that the projections and policies were not required to be certified by a U.S. projection actuary. FE 1 had numerous conversations with Citizens' legal team in 2014 and 2015, including now-CEO Defendant Kolander, in which FE 1 warned that the projections provided to clients were not in compliance with U.S. projection laws if the policies were not considered foreign policies. FE 1 also recalled having discussions with Kolander when he was General Counsel regarding concerns over whether it was legal for Citizens to use policy dividends to purchase its stock if the policies were U.S.-based policies. Kolander said that he conducted his own legal research and "unconcerned himself" with the matter. FE 1 was wrongfully terminated by Citizens when it blamed him for the Company's Section 7702 issues.

46. Presented with these extraordinary stock price projections and purported guaranteed returns, many policyholders likely do not understand the significance of their exposure to Citizens' stock price. Based on interviews of seven current or former brokers, the brokers rarely inform clients of the inherent risks of investing in Citizens stock because it is not even discussed as part of the broker training process. Even worse, brokers and pitchbooks repeat the false claim that most of the funds inside the policies are directly invested in U.S. Treasury Bonds. In fact, Citizens barely holds any U.S. Treasury Bonds. Instead, Citizens holds a portfolio of municipal and

corporate bonds, almost half of which are rated “A” or lower. Moreover, policyholders don't directly own any bonds; rather the “guaranteed” portion of the policy is backed directly by Citizens’ credit, which is not even rated by Moody’s or Standard and Poors.

47. Moreover, brokers present themselves as “financial advisors” with international licenses that allow them to sell policies anywhere in the world except the United States (a limitation intended to keep the brokers out of reach of U.S. regulators). In fact, the "licenses" are actually certificates awarded by Citizens, and signed by Defendant Osbourn, after the brokers complete the Company’s two-week training session. The following is an example of the “certificate” that provides the salesforce with the pretense of credentials to sell Citizens’ policies and securities:

**Lisbeth Márquez** at Citizens Academy, Lake Buchanan.
August 26, 2016 · Buchanan Dam, TX ·

Agradecida con Dios y con Cica Life por brindarme la oportunidad de participar en este distinguido entrenamiento #cicalife #tranquilidadseresqueridos #seguridad #estudiosuniversitaros #edaddorada #calidad

> Thankful with God and with cica life for giving me the opportunity to participate in this distinguished training #cicalife #tranquilidadseresqueridos #safety #estudiosuniversitaros #goldenage #quality
>
> · Rate this translation




48. Despite selling policies based on forecasts of Citizens' stock price that are contrived entirely by the brokers, CICA brokers (who often lack substantive financial experience) typically hold no actual securities or insurance licenses.

49. Further, Citizens does not inform new foreign policy holder that their policies are not tax exempt under Section 7702.

**Citizens Reveals That Its Life Insurance Policies Are Taxable**

50. Normally, whole-life insurance proceeds and benefits are not taxable, and Citizens marketed its insurance policies as tax-exempt. However, on March 11, 2015, Citizens announced on a Form 8-K filed with the SEC that its management had determined that "a substantial portion of its endowment policies and whole life insurance policies do not qualify for the favorable U.S. federal income tax treatment afforded by Sections 7702 and 7702A of the Internal Revenue Code of 1986. The policies at issue were primarily sold to non-U.S. citizens residing abroad."[5]

51. Although concealed by Defendants, the effects of this Section 7702 determination cannot be understated—Citizens now viewed its policies as subject to U.S. regulations, casting its entire business operations into doubt.

52. Citizens later announced it would remediate the policies held by its domestic customers, but not those held by foreign policyholders, meaning current and future foreign policyholders suddenly found themselves on the hook for tax payments on policies which were and continue to be sold by brokers as tax-exempt.

**Citizens' Chief Financial Officer is Terminated by Defendants After He Uncovers Serious Red Flags and Securities Law Violations**

53. In light of the Company's questionable business practices and adverse determination on the Section 7702 issue, Citizens hired FE 2 on October 12, 2015, to serve as the company's Chief Financial Officer and Treasurer. FE 2 succeeded Kay Osbourn, who then became Citizens' President and Chief Corporate Officer—a position not required to certify SEC filings.

54. As CFO, FE 2 was responsible for establishing and maintaining Citizens' disclosure

[5] Section 7702 limits the tax benefits given to life insurance policies. It defines what should be considered a life insurance policy, and investment vehicles that do not fall under the insurance definition are not eligible for the favorable tax treatments.

controls and procedures under the U.S. Securities Laws. He was acutely aware of the Company's previously-disclosed material weaknesses in its internal controls over financial reporting and the adverse Section 7702 determination.

55. FE 2 understood that, among his responsibilities as CFO, he would be required to provide his personal certification, under oath, that Citizens' statements in its public securities filings to the SEC did not contain any materially untrue statements of fact and did not omit any material facts. He further understood that knowingly providing a false certification would expose him and Citizens to potential liability under Sarbanes-Oxley, Dodd-Frank, and the U.S. Securities Laws.

56. FE 2 believed that Citizens hired him to create robust internal controls to avoid repeating the Company's prior mistakes with respect to financial reporting and the sale of tax-exempt insurance policies. He was wrong.

57. After the first few days of getting settled into his office, FE 2's priority was to get his arms around the Company's insurance operations and accounting department. FE 2 was asked by Osbourn to perform a deep dive into Citizens' accounting procedures, financial controls, and reporting procedures. Osbourn also wanted FE 2 to sign off on the Company's financials for the third quarter, as the Form 10-Q for 2015's third quarter had to be filed with the SEC in early November.

58. The accounting department was headed by Larry Carson, and also consisted of Barbara Lick.

59. FE 2 was immediately concerned with the Section 7702 tax issue because Citizens continued to sell insurance products to foreigners marketed as tax-exempt notwithstanding the Company's determination that those policies were taxable. FE 2 was uncomfortable with the fact that Citizens had not made any changes to the life insurance policies it sold and continued to sell.

Equally important, he was also worried Citizens had not adequately disclosed the Section 7702 issue to existing policyholders and that it was possibly illegal to sell the policies.

60. When FE 2 discussed this issue with Osbourn, the accounting department, and Kolander, he was told that everything was fine because Citizens had reserved some money ($13.9 million, the low end of the Company's own estimated range) to cover liabilities arising out the Section 7702 issue. But FE 2 knew that not only was this reserve inadequate because it was deficient by at least $80 million, it also did nothing to rectify the ongoing deception to policyholders.

61. FE 2 also became aware of the so-called "Irish solution." FE 2 learned that instead of remediating the non-compliant insurance policies and the liabilities associated with the Section 7702 issue, Citizens had begun a process to set up a subsidiary in Ireland to avoid any U.S. tax liabilities and regulations, and to avoid the gamut of Section 7702 liabilities. Citizens rushed to get approval from Irish regulators before the IRS had an opportunity to audit the Company. In fact, Larry Carson told FE 2 that "if we don't get the Irish solution, we're going to have to shut the doors."

62. FE 2 was shocked. He discovered that the company had only had one meeting with Irish regulators in Ireland, and he also believed that the Company had neither the necessary capital or the time to plausibly execute this plan. He also believed that the Company had not reserved sufficient funds to cover the potential liabilities associated with the Section 7702 issue.

63. FE 2 also recommended that the Company conduct formal impairment testing on outstanding receivables that had not been paid since 2011, as well as on outstanding mortgage loans.

64. After raising these concerns to Osbourn and the accounting department in the first couple of weeks of his employment, FE 2 noticed that the tone at the Company changed. Sensing that he

perhaps had asked too many troublesome questions, FE 2 noticed that he was excluded from many meetings between Osbourn, the accounting department, and Kolander and his legal department.

65. On November 4, 2015, Osborne telephoned FE 2 to make sure that he was going to certify the third-quarter Form 10-Q, which was to be filed just two days later. Osbourn was in New York with other executives and board members. FE 2 informed Osbourn that, given the problems he had previously raised, he was unable to sign off on the Form 10-Q without additional disclosures.

66. FE 2 told Osbourn that the Company's exposure to liabilities related to the Section 7702 issue could leave Citizens with inadequate statutory capital.

67. FE 2 told Osbourn that he did not agree with the Company's stance of continuing to sell insurance policies without disclosing that the policies were not tax-exempt. Osbourne told FE 2 not to worry because the Company was going to pay the tax liabilities of policyholders as they came due out of the Company's cash reserves. FE 2 told her that this was misleading and fraudulent because it was impossible to know the individual tax liabilities of policyholders, which made it impossible for the Company to accurately reserve enough cash. FE 2 told Osbourn that this approach would also cause reserves to continue to increase as more policies were sold or abandoned.

68. FE 2 also expressed concerns about the viability of the "Irish solution," and that the Company could not simply avoid the IRS by moving CICA to Ireland.

69. FE 2 also told Osbourn that Citizens continued to have material weaknesses over disclosure controls and procedures, and that this material weakness must be disclosed to shareholders.

70. FE 2 further expressed concerns to Osbourn that Citizens was telling its sales force that the Section 7702 issue "doesn't change a thing" with respect to future policy sales to foreign retail investors. FE 2 told Osbourn that this was fraud.

71. For these reasons, FE 2 told Osbourn that he could not certify the Company's financials under Sarbanes-Oxley, which required FE 2 to certify under oath that the company's disclosures did "not contain any untrue statement of material fact or omit to state a material fact." Osbourn told FE 2 that she would get back to him.

72. The next day, November 5, Citizens' board members conducted an Audit Committee meeting in New York. Although he was the CFO, the Audit Committee only allowed FE 2 to participate in the meeting by phone from Austin. FE 2 was allowed on the call for only 5 minutes. The Audit Committee did not mention anything to FE 2 about the issues he had raised with Osbourn the night before, nor did its members ask him any questions about any concerns he had with the Company's financial reporting and disclosures.

73. Instead, the next morning, November 6, Citizens fired FE 2.

74. The Form 10-Q that FE 2 was terminated for refusing to certify was filed with the SEC on November 9, 2015. It was certified as compliant with the truthfulness and accuracy requirements of Sarbanes-Oxley, Dodd-Frank, and the U.S. Securities Laws by the signatures of Osbourn and Rick Riley, Citizens' CEO. None of the concerns FE 2 raised to Osbourn and the Company during his tenure and on November 4 were properly addressed and disclosed in that filing.

**Citizens Continues to Engage in lllegal Business Practices**

75. Similar to all Ponzi-like schemes, Citizens requires a constant flow of new money to continue its operations. However, the Company's financial reports show that many existing policyholders are now asking to cash out, while Citizens has struggled to bring in new investors.

76. After experiencing increased operating losses and liabilities in 2015, Citizens slashed the all-important dividend payments to policyholders by 34% through September 2016. The dividends help drive purported returns to policyholders, so they are integral to maintaining policyholder

confidence in Citizens. Following the dividend cuts, the Company's financials show that policyholder sales have plummeted while policy surrenders (early redemptions) have spiked.

77. After having steadily increased for years, new policy sales (first year premiums) declined by 2.7% in 2015. The company attributed the decline to the departure of Randall Riley, explaining that "marketing transition takes time." However, this explanation appears insufficient because first year premiums were down another 0.5% in 2016.

78. Simultaneously, policy surrenders (early terminations) have spiked. Surrender expenses surged by over 39% between 2014 and 2016, which the company credited as "primarily related to our international business," but initially attributed the increase to mere "aging" as older policies no longer have surrender penalties associated with them. However, the Company's filings now state that much of this activity is coming from earlier duration policies (which still have surrender charges). This means that policyholders are increasingly willing to pay the enormously punitive surrender charges (amounting to 50-100% of accrued value during the first 10 years) just to terminate their policies.

79. The Company's financial reports also show that Citizens' tangible capital is eroding. Although capital remains above regulatory minimums, from 2013 through the end of 2015 Citizens' statutory equity (a regulatory capital calculation) fell by roughly 22%, to just $93 million. This concern was specifically raised by FE 2 to Osbourn. In 2016 that number fell to $35 million. Cash on hand has declined from $82 million at the start of 2016 to just $36 million at the start of 2017. In November 2016, Citizens transferred $20 million of capital from its domestically-focused Louisiana life insurance subsidiary to its internationally-focused CICA subsidiary, a transaction which signals further capital issues because most of the policies are being redeemed from CICA.

80. Citizens' policies also include an "autoloan" feature whereby the Company will automatically pay premiums for policyholders by making loans against the value of their accounts. The policy loan balances have nearly doubled over the past 5 years, increasing by over 10% each year, suggesting that surrender rates are being artificially suppressed because the Company itself is financing premium payments on an increasing number of policies.

81. Citizens has experienced drastic turnover of its senior management since the Section 7702 issue came to light. Citizens' founder and controlling shareholder, Defendant Harold Riley, stepped down as Chairman and CEO in June 2015, replaced by his son, Defendant Rick Riley. A year later, in June 2016, Rick Riley resigned as Chairman, CEO and director. The Chairman of the Company's Audit Committee also resigned in June 2016, and Harold Riley's wife, Dottie, has also resigned from the board.

82. Rick Riley was terminated for creating an undisclosed and special insurance policy issued by Citizens that paid six percent interest into an account for the benefit of his wife and himself,[6] and Defendants did their best to cover it up by failing to disclose the circumstances of Rick Riley's ignominious departure. On June 8, 2016, the Company issued a press release announcing that a new Chairman had been appointed to succeed Rick Riley, and that Osbourn had been appointed interim CEO, effective immediately. The immediate and suspiciously tacit implication was that Rick Riley was no longer holding those positions. In its characteristic style of vagueness and opacity, the Company did not specify whether Rick Riley had resigned or whether he was removed, only that he would remain as a director.

83. On June 28, 2016, the Company filed a Form 8-K with the SEC announcing Rick Riley's retirement as a Citizens employee and resignation from the Board, effective immediately. No

[6] According to FE 1 and FE 3, Rick Riley received approximately $67,000 in excess interest payments.

reason or circumstances were ascribed to the resignation, save for Rick Riley's statement that "I look forward to the next chapter in my life and the opportunity to focus on improving my health and to spend much needed time with my family."

84. However, on August 9, 2016, the Company filed its quarterly report with the SEC on Form 10-Q, quietly stating:

> During the second quarter of 2016, it was discovered that an ex officer of the Company, while serving as an officer, created an interest bearing deposit account associated with a company-issued life insurance policy using an interest rate in excess of normal Company limits. The excess interest was returned in the second quarter of 2016 and the ex-officer retired from the Company in all capacities at that time. The excess interest was an immaterial amount that had no material impact on the Company's financial statements.

No other officer of Citizens resigned or was removed during the second quarter of 2016, so this statement must have been referring to Rick Riley.

85. Perhaps owing to the continuing influence and family legacy of its founder, the Company's initial statements in its June 2016 8-Ks knowingly omitted the real reason for Rick Riley's departure, falsely implied it was due to Rick Riley's health and family, and never directly attributed the misconduct – once it was finally disclosed two months later – to Rick Riley.

86. Eventually, even the Company's auditors had seen enough and resigned. On June 30, 2017, Citizens filed a Form 8-K with the SEC, disclosing that the Company was "notified by its independent registered public accounting firm, Ernst & Young, LP ("EY") of its decision to resign as the Company's independent registered public accounting firm." According to FE 1, the Company's previous auditor, KPMG, had also ended its relationship with Citizens due to a disagreement with some of Citizens' executives regarding its business practices.

87. The Company is also currently under investigation by the U.S. Securities and Exchange Commission and Internal Revenue Service. Neither investigation has been disclosed to investors.

**Materially False and Misleading**
**Statements Issued During the Class Period**

88. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

**Misleading Disclosures Regarding the Citizens Stock Purchase Plan**

89. On March 11, 2015, the Company filed a Form 8-K signed by Rick Riley. The 8-K stated:

> As part of an internal operation review of the life insurance products issued by our subsidiary insurance companies, the Company's management determined during the first quarter of 2015 that a substantial portion of its endowment policies and whole life insurance policies do not qualify for the favorable U.S. federal income tax treatment afforded by Sections 7702 and 7702A of the Internal Revenue Code of 1986. The policies at issue were primarily sold to non-U.S. citizens residing abroad. The failure of these policies to qualify under Sections 7702 and 7702A is expected to result in charges to the Company's consolidated financial statements for the fiscal year ended December 31, 2014. At present, the Company is unable to quantify with reasonable certainty the magnitude of the charge expected to result from this tax compliance issue, but it is expected to be material to the Company's financial condition and 2014 results of operations.
>
> The Company has retained an independent actuarial firm to assist it with the analysis of this issue. The Company is presently working with this actuarial firm and its independent auditor to determine the magnitude of the effect this issue will have on the Company's financial condition and results of operation. However, until this analysis is complete, the Company cannot estimate the amount or range of the expected charge and will not be able to complete its Annual Report on Form 10-K for 2014 on a timely basis without unreasonable effort or expense.
>
> In its Current Report on Form 8-K filed by the Company on January 16, 2015, the Company announced a conference call for March 12, 2015 to discuss its operating results for the fourth quarter and the year ended December 31, 2014. This call is cancelled.

90. The Company's 2014 10-K,[7] 1Q15 10-Q,[8] 2Q15 10-Q,[9] and 3Q15 10-Q[10] stated the following concerning risks relating to the Company's capital stock:

> ***The price of our Class A common stock may be adversely affected by decreased participation in the Citizens, Inc. Stock Investment Plan (the "Plan").***
>
> If an international applicant for insurance submits a "Consent to be Contacted" form to Citizens with his or her insurance application, then Citizens will submit a copy of the Plan Prospectus once the applicant's insurance policy is fully underwritten. At that time the international applicant is invited by Citizens to participate in the Plan and afforded the opportunity to invest certain policy dividends into the Plan. Most all of our international policyholders participate in the Plan and they invest their policy dividends and benefits in our Class A common stock pursuant to the Plan. Once a policyholder elects to participate in the Plan, his or her policy benefits are assigned to purchase Citizens Class A common stock under the Plan in the open market. ***There is a risk our Class A common stock price could be negatively impacted by a decrease in participation in the Plan. If fewer policyholders elect to participate in the Plan, or our international premium collections were to decrease as a result of regulatory, economic, or marketing impediments, the trading volume of our Class A stock may decline from its present levels and the demand for our Class A common stock could be negatively impacted.***

---

[7] On April 6, 2015, the Company filed a Form 10-K for the fiscal year ended December 31, 2014 (the "2014 10-K") with the SEC. The 2014 10-K was signed by Defendants Harold Riley, Rick Riley and Osbourn. Attached to the 2014 10-K were certifications pursuant to the Sarbanes Oxley Act of 2002 ("SOX") signed by Defendants Harold Riley, Rick Riley and Osbourn attesting to the accuracy of the financial statements, the disclosure of all material weaknesses in the Company's internal control over financial reporting and the disclosure of all fraud.

[8] On May 6, 2015 the Company filed a Form 10-Q for the quarterly period ended March 31, 2015 (the "1Q15 10-Q") with the SEC. The 1Q15 10-Q was signed by Defendants Harold Riley, Rick Riley and Osbourn. Attached to the 1Q15 10-Q were SOX certifications signed by Defendants Harold Riley, Rick Riley and Osbourn attesting to the accuracy of the financial statements, the disclosure of all material weaknesses in the Company's internal control over financial reporting and the disclosure of all fraud.

[9] On August 6, 2015 the Company filed a Form 10-Q for the quarterly period ended June 30, 2015 (the "2Q15 10-Q") with the SEC. The 2Q15 10-Q was signed by Defendants Rick Riley and Osbourn. Attached to the 2Q15 10-Q were SOX certifications signed by Defendants Rick Riley and Osbourn attesting to the accuracy of the financial statements, the disclosure of all material weaknesses in the Company's internal control over financial reporting and the disclosure of all fraud.

[10] On November 9, 2015 the Company filed a Form 10-Q for the quarterly period ended September 30, 2015 (the "3Q15 10-Q") with the SEC. The 3Q15 10-Q was signed by Defendants Rick Riley and Osbourn. Attached to the 3Q15 10-Q were SOX certifications signed by Defendants Rick Riley and Osbourn attesting to the accuracy of the financial statements, the disclosure of all material weaknesses in the Company's internal control over financial reporting and the disclosure of all fraud.

91. The Company's 2015 10-K,[11] 1Q16 10-Q,[12] 2Q16 10-Q,[13] and 3Q16 10-Q[14] stated the following concerning risks relating to the Company's capital stock:

> ***If our foreign policyholders reduced or ceased participation in our Stock Investment Plan (the "Plan") or if a securities regulatory authority were to deem the Plan's operation contrary to securities laws, the volume of Class A common stock purchased on the open market through the Plan, and the price of our Class A common stock, could fall.***
>
> More than 98% percent of the shares of Class A common stock purchased under the Plan in 2015 were purchased by foreign holders of life insurance policies (or related brokers); the remaining 2% of the shares of Class A common stock purchased under the Plan in 2015 were purchased by approximately 640 participants resident in the United States. The Plan is registered with the SEC pursuant to a registration statement under the Securities Act of 1933, but is not registered under the laws of any foreign jurisdiction. If a foreign securities regulatory authority were to determine the offer and sale of our Class A common stock under the Plan were contrary to applicable laws and regulations of its jurisdiction, such authority may issue or assert a fine, penalty or cease and desist order against us in that foreign jurisdiction. ***There is a risk our Class A common stock price could be negatively impacted by a decrease in participation in the Plan. If fewer policyholders elect to participate in the Plan, or our international premium collections were to decrease as a result of regulatory, economic, or***

---

[11] On March 24, 2016, the Company filed a Form 10-K for the fiscal year ended December 31, 2015 (the "2015 10-K") with the SEC. The 2015 10-K was signed by Defendants Harold Riley, Rick Riley and Jorgensen. Attached to the 2015 10-K were certifications pursuant to the Sarbanes Oxley Act of 2002 ("SOX") signed by Defendants Rick Riley and Jorgensen attesting to the accuracy of the financial statements, the disclosure of all material weaknesses in the Company's internal control over financial reporting and the disclosure of all fraud.

[12] On May 3, 2016 the Company filed a Form 10-Q for the quarterly period ended March 31, 2016 (the "1Q16 10-Q") with the SEC. The 1Q16 10-Q was signed by Defendants Rick Riley and Jorgensen. Attached to the 1Q16 10-Q were SOX certifications signed by Defendants Rick Riley and Jorgensen attesting to the accuracy of the financial statements, the disclosure of all material weaknesses in the Company's internal control over financial reporting and the disclosure of all fraud.

[13] On August 9, 2016 the Company filed a Form 10-Q for the quarterly period ended June 30, 2016 (the "2Q16 10-Q") with the SEC. The 2Q16 10-Q was signed by Defendants Osbourn and Jorgensen. Attached to the 2Q16 10-Q were SOX certifications signed by Defendants Osbourn and Jorgensen attesting to the accuracy of the financial statements, the disclosure of all material weaknesses in the Company's internal control over financial reporting and the disclosure of all fraud.

[14] On November 7, 2016 the Company filed a Form 10-Q for the quarterly period ended September 30, 2016 (the "3Q16 10-Q") with the SEC. The 3Q16 10-Q was signed by Defendants Osbourn and Jorgensen. Attached to the 3Q16 10-Q were SOX certifications signed by Defendants Osbourn and Jorgensen attesting to the accuracy of the financial statements, the disclosure of all material weaknesses in the Company's internal control over financial reporting and the disclosure of all fraud.

> ***marketing impediments, the trading volume of our Class A common stock may decline from its present levels, the demand for our Class A common stock could be negatively impacted and the price of our Class A common stock could fall.***

**Misleading Statements Concerning Effective Disclosure Controls**

92. The 2014 10-K stated the following concerning the Company's disclosure controls and procedures:

> Our Chief Executive Officer ("CEO") and our Chief Financial Officer ("CFO") are responsible for establishing and maintaining our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")). ***Based upon an evaluation at the end of the period, the Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective as of the end of the period covered by this annual report.***

93. The Company's 1Q15 10-Q, 2Q15 10-Q, and 3Q15 10-Q stated the following concerning the Company's disclosure controls and procedures:

> Our Chief Executive Officer, Vice Chairman and Chief Financial Officer are responsible for establishing and maintaining our disclosure controls and procedures (as defined in Rule 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")). ***Based upon an evaluation at the end of the period covered by this report, the Chief Executive Officer, Vice Chairman and Chief Financial Officer concluded that our disclosure controls and procedures were effective as of the end of the period covered by this quarterly report.***

94. The 2015 10-K stated the following concerning the Company's disclosure controls and procedures:

> Our Chief Executive Officer ("CEO") and our Chief Financial Officer ("CFO") are responsible for establishing and maintaining our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")). ***Based upon an evaluation at the end of the period, the Chief Executive Officer and Chief Financial Officer concluded that, in light of the material weakness described below, our disclosure controls and procedures were not effective as of the end of the period covered by this annual report.***

95. The 1Q16 10-Q, 2Q16 10-Q, 3Q16 10-Q stated the following concerning the Company's disclosure controls and procedures:

> Our Chief Executive Officer and Chief Financial Officer are responsible for establishing and maintaining our disclosure controls and procedures (as defined in Rule 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")). ***Based upon an evaluation at the end of the period covered by this report, the Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective as of the end of the period covered by this quarterly report.***

**Misleading Statements Concerning Internal Controls Over Financial Reporting**

96. The 2014 10-K stated the following concerning the Company's internal control over financial reporting:

> Management of our Company is responsible for establishing and maintaining adequate internal control over financial reporting. Management assessed internal control over financial reporting based on criteria established in Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission 2013 Framework("COSO"). ***Based on this assessment, management has concluded that the Company's internal control over financial reporting as of December 31, 2014 was not effective due to a material weakness in our control environment related to key employee competency as described below.***
>
> We became aware of an ineffective executive management review control as it pertains to our actuarial function that was relied upon by management. As part of an internal operation review of the life insurance products issued by our subsidiary insurance companies, the Company's management determined during the first quarter of 2015 that a substantial portion of its endowment policies and whole life insurance policies do not qualify for the favorable U.S. federal income tax treatment afforded by Sections 7702 and 7702A of the Internal Revenue Code ("IRC") of 1986. The policies at issue were primarily sold to non-U.S. citizens residing abroad. As a result, we have estimated that the failure of these policies to qualify under the IRC sections above could result in additional expenses of $11.4 million to $40.0 million net of tax, related to projected toll charges and fees as well as increased claims liability for past claims and reserves increases to bring policies into compliance. ***Due to the nature of this failure we believe this is an entity level control failure related to personnel competency and a lack of the appropriate sensitivity and precision in executive management's review of the actuarial function.*** Therefore, management assesses that there was a reasonable possibility that the Company's annual or quarterly financial statements could have contained a material misstatement that would not have been detected.
>
> ***Management has begun to remediate this material weakness by removing the Company's Chief Actuary and obtaining additional actuarial resources with appropriate expertise. Management also intends to initiate an enhanced risk***

> ***assessment program to mitigate this type of risk in the future, including, but not limited to, more robust internal controls directly related to the review of all aspects of the actuarial process.***

97. The 1Q15 10-Q, 2Q15 10-Q, and 3Q15 10-Q stated the following concerning the Company's internal control over financial reporting:

> During the three months ended [for the applicable quarter], there were no changes in the Company's internal controls over financial reporting that have materially affected, or are reasonably likely to materially affect, the Company's internal controls over financial reporting (as defined in rules 13a-15(f) and 15d-15(f) under the Exchange Act). ***The Company is in the process of remediating the material weakness identified within the Actuarial function as of December 31, 2014. Management is monitoring the remediation process and will assess the status of the material weakness as of each quarter end.***

98. Specifically with respect to the 3Q15 10-Q, these disclosures were false and misleading because none of the concerns FE 2 raised to Osbourne and the Company during his tenure and on November 4, 2015 were properly addressed and disclosed.

99. The 3Q15 10-Q also stated:

> Effective November 6, 2015, Kay E. Osbourn resumed the duties of Chief Financial Officer and Treasurer of the Company replacing [FE 2] who has been terminated. She will retain these duties until a successor is appointed. Mrs. Osbourn also is continuing to serve as President and Chief Corporate Officer.

100. This disclosure was false and misleading because it failed to disclose that FE 2 was terminated because he wanted the Company to disclose its material weaknesses regarding internal controls over disclosures and financial reporting with respect to the Section 7702 issue.

101. The 2015 10-K stated the following concerning the Company's internal control over financial reporting:

> Management of our Company is responsible for establishing and maintaining adequate internal control over financial reporting. Management assessed internal control over financial reporting based on criteria established in Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission 2013 Framework ("COSO"). ***Based on that assessment, management has concluded that our internal control over financial reporting as***

> ***of December 31, 2015 was not effective due to the material weakness described below.***
>
> ***As of December 31, 2015, we became aware of an ineffective management review control as it pertains to our tax review of external tax experts' complex documentation.*** Specifically, this documentation included the tax rollforward schedule that reconciles deferred taxes, uncertain tax position computations, life/non-life qualification tests and overall income tax expense recorded in the financial statements of the Company, all of which had some added complexity due to our IRC 7702 and 72(s) tax compliance issues. Although there is increased complexity of the tax documentation, management is responsible for the accuracy of the financial statements. Because of this ineffective management review control, there was a reasonable possibility that the Company's annual financial statements would have been filed containing a material misstatement. Management concludes there is a material weakness in this management review control. Management has begun documenting its remediation steps and strategy.

102. The 2015 10-K stated the following concerning changes in the Company's internal control over financial reporting:

> As previously discussed, as of December 31, 2015, management detected an ineffective management review control as it pertains to our tax review of external tax experts' complex documentation. This has resulted in a change in internal control over financial reporting during the current period. The Company did not have adequately designed and documented management review controls over the third party prepared tax documentation. Specifically, the management review controls did not adequately address management's expectations, criteria for investigation, and the level of precision used in the performance of the review controls, resulting in a material weakness in internal controls over financial reporting. ***Management has begun documenting its remediation steps and strategy.***
>
> As reported as of December 31, 2014, management became aware of an ineffective executive management review control as it pertains to our actuarial function that was relied upon by management. Due to the nature of the failure, management believed this was an entity level control failure related to personnel competency and a lack of appropriate sensitivity and precision in executive management's review of the actuarial function.
>
> ***The material weakness related to the sensitivity and precision of management's review control over the actuarial function is assessed by management to have been fully remediated as of December 31, 2015.***
>
> ***Remediation of the material weakness identified deficiency related to personnel competency in the actuarial function is assessed by management to be ongoing***

> ***as of December 31, 2015.*** However, in consideration of the changes and enhancements made to actuarial staff and support and the effective entity level controls, management does not believe that there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected on a timely basis related to this deficiency. Therefore management assesses the identified deficiency related to personnel competency in the actuarial function as a significant deficiency, which is a deficiency, or a combination of deficiencies, in internal control over financial reporting, that is less severe than a material weakness yet important enough to merit attention by those responsible for oversight of the Company's financial reporting.

103. The 1Q16 10-Q, 2Q16 10-Q, and 3Q16 10-Q stated the following concerning the Company's internal control over financial reporting:

> During the three months ended [for the applicable quarter], there were no changes in the Company's internal controls over financial reporting that have materially affected, or are reasonably likely to materially affect, the Company's internal controls over financial reporting (as defined in rules 13a-15(f) and 15d-15(f) under the Exchange Act). ***The Company is in the process of remediating the material weakness identified as an ineffective management review control as it pertains to our tax review of external tax experts' complex documentation as of December 31, 2015.***

**Misleading Disclosures Regarding Rick Riley's Termination**

104. On June 8, 2016, the Company issued a press release announcing that a new Chairman had been appointed to succeed Rick Riley, and that Osbourn had been appointed interim CEO, effective immediately. The Company did not specify whether Rick Riley had resigned or whether he was removed, only that he would remain as a director.

105. On June 28, 2016, the Company filed a Form 8-K with the SEC announcing Rick Riley's retirement as a Citizens employee and resignation from the Board, effective immediately. No reason or circumstances were ascribed to the resignation, save for Rick Riley's statement that "I look forward to the next chapter in my life and the opportunity to focus on improving my health and to spend much needed time with my family."

106. However, on August 9, 2016, the Company filed its quarterly report with the SEC on Form 10-Q, stating:

> During the second quarter of 2016, it was discovered that an ex officer of the Company, while serving as an officer, created an interest bearing deposit account associated with a company-issued life insurance policy using an interest rate in excess of normal Company limits. The excess interest was returned in the second quarter of 2016 and the ex-officer retired from the Company in all capacities at that time. The excess interest was an immaterial amount that had no material impact on the Company's financial statements.

107. Item 5.02(a) of Form 8K requires disclosure when a board member resigns because of a disagreement with the company that is known to an executive officer, on any matter relating to the company's operations, policies, or practices. In such an event, the company must provide, among other things, "a brief description of the circumstances that the registrant believes caused, in whole or in part, the director's resignation." The Company's initial statements in its June 2016 8-Ks knowingly omitted the real reason for Rick Riley's departure, falsely implied it was due to Rick Riley's health and family, and never directly attributed the misconduct to Rick Riley.

**Misleading Disclosures Concerning SEC and IRS Investigations**

108. The Defendants issued false and misleading statements concerning investigations by regulatory agencies in the Company's 3Q15 10-Q, 2015 10-K, 1Q16 10-Q, 2Q16 10-Q, and 3Q16 10-Q. Each of these filings states:

> From time to time we are, and have been, subject to a variety of legal and regulatory actions and investigations relating to our business operations, including, but not limited to:
>
> - regulatory compliance with state laws, including insurance and securities regulations;
> - regulatory compliance with U.S. federal securities laws, tax, anti-money laundering, bank secrecy, anti-bribery, anti-corruption and foreign asset control laws, among others;

109. These statements were materially false and/or misleading when made because, according

to FE 1 and FE 2, the Company has been under SEC investigation since at least November 2015, and the Company is also under IRS investigation.

**Misleading Disclosures Regarding Strategic Initiatives**

110. The Defendants issued false and misleading statements concerning Citizens' strategic initiatives in the Company's 2015 10-K, 1Q16 10-Q, 2Q16 10-Q, and 3Q16 10-Q. Each of these filings states:

> ***Strategic Initiatives***
>
> The Company's Board of Directors and executive management team are currently assessing the Company's business model and business strategies with the assistance and support of external consultants and advisors. Specifically, we are evaluating certain elements and assumptions underlying the Company's historical business model to consider potential changes to align with our risk profile, ***the current economic and regulatory environment and sustainable business objectives.*** Incorporated in our business model review are analyses of (1) our products and profitability; (2) ***a potential restructuring of our international business and operations;*** (3) potential upgrades to our technology systems and operations with a strategic focus on cyber risk and our future business needs; and (4) potential changes in our executive management structure, personnel needs and compensation incentives.

111. These statements were materially false and/or misleading when made because Kolander and Osbourn knew but failed to disclose that the Company could no longer sell its policies to international customers using false, unregulated projections concerning its stock performance, which would acutely affect demand for the Company's stock. Moreover, these Defendants knew that under the gamut of U.S. regulations, policy dividends could not be used to purchase Citizens stock. Kolander and Osbourne also failed to disclose the Company's efforts directed towards the "Irish solution."

112. In sum, the statements contained in ¶¶ 89-111 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations and prospects, which were known to Defendants or recklessly

disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company had additional, undisclosed material weaknesses in its internal control over financial reporting and disclosure controls; (2) Citizens' sales force was using false growth projections to entice policyholders to invest dividends into the Plan; and (3) the Company's business practices, relying on new policyholder investments to guarantee the returns for existing policyholder investments and inflate the Company's stock price, were unsustainable and starting to deteriorate, particularly in light of the Company's decision not to remediate foreign policies in light of the Section 7702 determination and the Company's decision to slash dividend rates for policyholders. As a result, Defendants' statements about the Company's business, operations, and prospects, were materially false and misleading and/or lacked a reasonable basis at all relevant times.

**The Truth Emerges**

113. On March 8, 2017, *Seeking Alpha* published an article asserting that Citizens sells insurance policies to foreign retail investors and retirees that funnel millions of dollars into open market purchases of the Company's shares and inflate the value of such shares, stating in relevant part:

> **Summary**
>
> - Citizens sells insurance policies through a network of brokers who prey on foreign families and retirees with promises of "guaranteed returns" backed by U.S. Treasuries that will secure retirements.
> - The money is not invested in Treasuries and the policies funnel millions into continuous open market purchases that have inflated CIA shares to absurd valuation levels.
> - Because most of the returns to existing policyholders are driven by funds contributed by new policyholders, Citizens displays some characteristics that appear analogous to a Ponzi scheme.

- Citizens requires a constant influx of new money. However, the financials show that many existing policyholders are now asking to be cashed out while new policy sales have plummeted.

- Longtime insiders have departed amidst evidence of serious problems that suggest Citizens has moved towards the brink of collapse. Each day it persists, new victims are created.

**Research Summary**

Citizens, Inc. (NYSE: CIA) uses a network of unregulated brokers to sell complex life insurance policies to foreign retail investors and retirees. The policies are sold through promises of outsized “guaranteed” returns backed by U.S. Treasury bonds. However, the money is not invested in U.S. Treasuries and the policies appear designed to prop up Citizens' stock price.

Because most of the returns to existing policyholders are driven by funds contributed by new policyholders, Citizens displays some characteristics that appear analogous to a Ponzi scheme. The performance of CIA shares drive the returns to existing policyholders, but these purported returns hinge directly on Citizens' ability to prop up its stock price with a constant flow of new money from policyholders.

The money is funneled from policyholders into Citizens' stock through a feature in which a portion of premiums is paid back as benefits and “dividends.” These funds are routed to Citizens' transfer agent who facilitates continuous purchases of CIA shares in the open market.

The dividend feature is structured so that most of the projected policy value hinges on the performance of CIA stock. But the inherent risks are often concealed from retail investors who are falsely told that most of their money is backed by U.S. Treasury Bonds inside “savings accounts” that will secure their retirement or children's education.

Citizens' founder has publicly declared that “the market has no ceiling” as brokers prey on unsophisticated families through falsehoods. Retail investors are drawn in by misleading return projections. An exaggerated sense of legal standing is projected through “licenses” awarded to brokers by Citizens itself, while sales presentations use the SEC's logo as a marketing device.

With foreign policyholders now owning over an estimated 70% of the float, Citizens stock has been inflated to absurd valuation levels. We calculate that shares (which produce GAAP losses) trade at 7.5x adjusted tangible book value, making Citizens the most mispriced insurance stock we have ever seen.

> Citizens' inflated stock price has enriched insiders while compensating brokers through commissions partially paid through interests in offshore trusts specifically created to buy CIA stock.
>
> Citizens' ongoing viability is directly dependent on keeping its stock price propped up. But since Citizens' stock price has no economic basis, the fundamental problem is that the purported returns are illusory.
>
> To maintain the mirage, Citizens depends on a constant influx of new money. However, the financials show that many existing policyholders are now asking to be cashed out. Simultaneously, plummeting policy sales and broker defections have made it increasingly difficult for Citizens to entice new investors.
>
> This dynamic is exactly why Ponzi Schemes collapse and, similarly, is why Citizens' business model is doomed.
>
> The cracks in Citizens' façade are starting to appear. The recent surge in early policyholder withdrawals has eroded Citizens' tangible capital and liquidity. As policyholders begin to head for the exits, loans Citizens makes to finance policyholder premium payments have ballooned to the point where the balance exceeds our calculations of tangible equity. Meanwhile, operating losses, increased liabilities, and an assortment of festering balance sheet issues cause us to question the company's true solvency.
>
> Longtime Executives and Directors have departed as the company has descended into turmoil. Revelations of anti-money laundering deficiencies and a Panama Papers exposure create concern that CIA shares are potentially being used as a currency to launder money through Citizens' insurance policies. Amidst government investigations, delinquent SEC filings and adverse audit opinions of internal controls have given way to admissions of actuarial incompetence and systemic tax compliance problems.
>
> Our research demonstrates that Citizens appears to have moved towards the brink of collapse. Each day that it persists, new victims are being created, with unsuspecting retail investors and retirees ultimately paying the price.

114. The article also disclosed for the first time that the Company was under investigation by the SEC and IRS.

115. On this news, the Company's shares fell $0.45 per share or over 5% over the next two trading days to close at $8.00 per share on March 9, 2017, damaging investors.

116. On April 27, 2017, the Company filed a Form 10-K for the fiscal year ended December 31,

2016 (the "2016 10-K") with the SEC. The 2016 10-K stated in pertinent part:

> *(a) Evaluation of Disclosure Controls and Procedures*
>
> We have established disclosure controls and procedures to ensure, among other things, material information relating to our Company, including its consolidated subsidiaries, is communicated to senior management, including our officers who certify our financial reports, and to the Board of Directors to allow for timely decisions regarding required disclosure.
>
> Our Chief Executive Officer ("CEO") and our Chief Financial Officer ("CFO") are responsible for establishing and maintaining our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")). ***Based upon an evaluation at the end of the period, the Chief Executive Officer and Chief Financial Officer concluded that, in light of the material weaknesses described below, our disclosure controls and procedures were not effective as of the end of the period covered by this annual report.***
>
> *(b) Management Report on Internal Control over Financial Reporting*
>
> Management of our Company is responsible for establishing and maintaining adequate internal control over financial reporting. Management assessed the effectiveness of internal control over financial reporting based on criteria established in Internal Control — Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"). ***Based on this assessment, management has concluded that our internal control over financial reporting as of December 31, 2016 was not effective due to the material weaknesses described below.***
>
> A material weakness is a deficiency, or combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of our annual or interim financial statements will not be prevented or detected on a timely basis. Management has identified the following deficiencies that it believes constituted material weaknesses in our internal control over financial reporting as of December 31, 2016:
>
> • ***Management determined that the Company had ineffective data validation and management review controls over key spreadsheets and system-generated reports.*** These reports included data and information utilized in the preparation of financial statements and disclosures. We determined that several control deficiencies that exist aggregated to a material weakness related to the design and operating effectiveness of our controls to ensure that key spreadsheets and system-generated reports were properly reviewed for completeness and accuracy. In addition, certain management review controls were not performed at a sufficiently precise level to identify errors that may result in a material misstatement of the

financial statements.

• The Company outsourced to third party service providers the valuation of certain insurance reserves and the computation of income taxes. ***Management has concluded that the Company's data validation controls over data provided to and received from third party service providers and management review controls were not designed with appropriate levels of precision or sensitivity to ensure that a material misstatement would be prevented or detected in a timely manner.***

• ***Management determined that a material weakness exists due to a lack of appropriate internal staff competency and expertise related to complex tax and actuarial computations.*** This lack of competency impacted the precision, depth and timeliness of management review controls in these areas, resulting in the possibility that a material misstatement in these computations may not have been prevented or detected in a timely manner.

117. While the Defendants continue to be as vague and opaque as possible in describing the Company's material weaknesses, these disclosures finally revealed that (1) Citizens was knowingly allowing and training its sales force to use spreadsheets to create grossly exaggerated and misleading projections of its stock performance to sell its policies; (2) the Company's valuation of insurance reserves and income tax liabilities were inaccurate and misleading, just as FE 2 had warned Osbourn and Kolander when he refused to sign off on the Company's financials and was fired instead; and (3) the Company's 7702 issues were not remediated by simply blaming and firing its Chief Actuary (FE 1) in the first quarter of 2015, and that, in fact, the Company's business practices, relying on new policyholder investments to guarantee the returns for existing policyholder investments and inflate the Company's stock price, were unsustainable and starting to deteriorate, particularly in light of the Company's decision not to remediate foreign policies in the wake of the Company's Section 7702 determination and the decision to slash dividend rates for policyholders.

118. Moreover, although known since the first quarter of 2015, the Company finally admitted that its Section 7702 determination may cause it to withdraw from certain "jurisdictions" (*i.e.* international markets where the majority of its sales occur):

> Depending on the ultimate outcome of our ongoing compliance review, we may explore alternatives to our current business model in one or more jurisdictions, including withdrawing from a particular market. We cannot assure you that any of these laws, regulations, or application of them by foreign regulatory authorities, or any change in our business model, will not have a material adverse effect on our ability to market our products through our independent marketing consultants and, in turn, on our results of operations and financial condition.

119. On this news, the Company's shares fell $0.34 per share or about 5% over the next two trading days to close at $6.76 per share on May 1, 2017, damaging investors.

120. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

121. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who purchased or otherwise acquired Citizens securities publicly traded on NYSE during the Class Period and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Officer or Director Defendants have or had a controlling interest.

122. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Citizens securities were actively traded on NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through

appropriate discovery, Plaintiffs believe that there are hundreds, if not thousands of members in the proposed Class.

123. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

124. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

125. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a. whether the Exchange Act was violated by Defendants' acts as alleged herein;

b. whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition and business of the Company;

c. whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

d. whether the Defendants caused the Company to issue false and misleading SEC filings during the Class Period;

e. whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings during the Class Period;

f. whether the prices of Citizens securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

g. whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

126. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

127. Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

a. Citizens securities met the requirements for listing, and were listed and actively traded on NYSE, a highly efficient and automated market;

b. As a public issuer, the Company filed periodic public reports with the SEC and NYSE;

c. The Company regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d. The Company was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

128. Based on the foregoing, the market for Citizens securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of the shares, and Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

129. Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

**COUNT I**

**For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder Against All Defendants**

130. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

131. This Count is asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

132. During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

133. Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they: employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or engaged in acts, practices and a course of business that

operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Citizens securities during the Class Period.

134. Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

135. Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Company personnel to members of the investing public, including Plaintiffs and the Class.

136. As a result of the foregoing, the market price of Citizens securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of Citizens securities during the Class Period in purchasing Citizens securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

137. Had Plaintiffs and the other members of the Class been aware that the market price of Citizens securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased Citizens securities at the artificially inflated prices that they did, or at all.

138. As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

139. By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchase of Citizens securities during the Class Period.

## COUNT II

### Violations of Section 20(a) of the Exchange Act Against the Individual Defendants

140. Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

141. During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about the Company's misstatement of revenue and profit and false financial statements.

142. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

143. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period concerning the Company's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Citizens securities.

144. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by The Company.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and the Class, pray for judgment and relief as follows:

(a) declaring this action to be a proper class action, designating Plaintiffs as Lead Plaintiffs and certifying Plaintiffs as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating Plaintiffs' counsel as Lead Counsel;

(b) awarding damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, together with interest thereon;

(c) awarding Plaintiffs and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) awarding Plaintiffs and other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: July 31, 2017

Respectfully submitted,

/s/ *Yusuf A. Bajwa*
Yusuf A. Bajwa
Texas Bar No. 24047754
**Sanders Bajwa LLP**
919 Congress Avenue, Suite 750
Austin, Texas 78701
Tel: 512-535-5207
Fax: 512-270-5111
ybajwa@sandersbajwa.com

Phillip Kim, Esq. (not admitted)
Laurence M. Rosen, Esq. (not admitted)
**The Rosen Law Firm, P.A.**
275 Madison Avenue, 34th Floor
New York, NY 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
pkim@rosenlegal.com
lrosen@rosenlegal.com

*Lead Counsel for Lead Plaintiffs*